Estate of Clarence W. Watson, deceased, Ernest Hutton, as administrator with the will annexed v. Commissioner.
Estate of Watson v. Commissioner
Docket No. 108716.
United States Tax Court
1944 Tax Ct. Memo LEXIS 76; 3 T.C.M. (CCH) 1108; T.C.M. (RIA) 44338; October 20, 1944
*76 Wood Bouldin, Jr., Esq., for the petitioner. P. A. Bayer, Esq., for the respondent. LEECH Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent determined deficiencies in income taxes and a penalty as follows: Delinquency
Year
Income Tax
Penalty
1938
$11,072.91
$2,768.22
1939
10,902.16
1940
3,451.72
The penalty depends upon the amount of the deficiency for the calendar year 1938. The deficiencies in all three years result from the action of the respondent in including in decedent's income for each of those years certain amounts respondent alleges were then received by decedent as compensation for services rendered to the Elk Horn Coal Corporation. We find the following: Facts Clarence W. Watson (hereinafter referred to as "Watson") died on May 24, 1940. Ernest Hutton was appointed administrator, c.t.a., of his estate, and qualified as such. The Federal income tax returns of decedent for the calendar years 1938, 1939 and 1940 were filed with the collector of internal revenue for the district of West Virginia. The return for the year 1938 was delinquent. Watson was continuously connected with the Elk Horn Coal Corporation (hereinafter called *77 "Elk Horn") in various important executive capacities from a time many years prior to 1931 to his death. For some time prior to August 1931 he was chairman of the board of directors. In that month he was appointed receiver. Immediately following that he was appointed trustee of the company in its reorganization under section 77B of the Federal Bankruptcy Act. This reorganization was completed in 1937, at which time Watson became president of the company, and the office of chairman of the board was abolished. From sometime prior to November 1, 1930 Watson received a salary of $25,000 a year as chairman of the board of directors. On November 1, his salary was reduced 15 per cent, with all other salaries in the company, because of the adverse conditions in the coal industry. He received that salary during his incumbency as receiver of the company, until July 1, 1932, when it was reduced another 10 per cent, together with all other salaries in the company, because of continuing adverse conditions in the coal industry. On March 15, 1938 his salary was again adjusted by its further reduction to the extent of 50 per cent, together with the salaries of all other employees, because of the *78 withdrawal of minimum prices on bituminous coal and the resulting chaotic conditions in the industry On August 1, 1938 his then salary of $750 per month was increased to $1,125 per month, commensurately with the salaries of other employees of the company. On November 1, 1938 his salary was increased to $1,312.50 per month in December, to $1,406.25 per month, proportionately with all other employees of the company. The salaries remained constant from then until May 31, 1939 when his salary, together with other salaries of the officers and employees, was increased, and decedent then received $1,500 per month. Sometime prior to January 1, 1937, decedent became indebted to Elkk Horn for a loan in the principal amount of $155,000, evidenced by a note. On that date there remained an unpaid balance of $126,336.65 on account of the principal of that loan. The then total amount of the balance due on the original indebtedness, together with accrued interest thereon, was $219,706.88. Watson became hopelessly insolvent in 1929 or 1930. Throughout the period January 1, 1938 to May 24, 1940, the date of his death, he was insolvent by more than $220,000. Watson consistently took the position that *79 the loan evidenced by his note to Elk Horn was used for the benefit of the company and that he not only should not have to pay it, but was unable to do so. In December 1936, Elk Horn reduced the asset value of the note on its books to $19,000, by setting up a reserve in the amount of $200,000 - there being collateral of Watson attached to the note in the amount of $19,000. The funds permitting the reorganization of Elk Horn in 1937 were secured from a subsidiary of the Chesapeake & Ohio Railway Company, with the understanding that the new company would be reorganized around Watson. In the negotiations culminating in that reorganization, it was understood that Watson, then 72 years of age, and his friends, should be given sufficient common stock as to provide substantial control. Although Watson was the key figure in arranging the funds for the reorganization, those who furnished the money did not know of Watson's note in the possession of the company, and his acceptance of the presidency of the reorganized company was not based upon any action of the company in reference to this note. The officers of the new company, exclusive of decedent, in the negotiations preceding the submission *80 of a proposed contract of employment to petitioner, were desirous of eliminating Watson's note from the books of the company without payment, in some way that would bear the apparent stamp of legality. Thus, on June 11, 1937, the following contract was submitted to and accepted by Watson: "THE ELK HORN COAL CORPORATION Incorporated 4100 Carew Tower Cincinnati, Ohio June 11th, 1937 "Senator C. W. Watson, Fairmont, West Virginia. "Dear Senator Watson: "You have been serving as President of this Corporation since its organization without, however, there being any formal agreement as to the tenure of your office or the compensation therefor. This will advise you that at a meeting of the Board of Directors of The Corporation held June 10th, 1937, the following resolution was adopted: 'Resolved (1) That this Corporation enter into a contract with C. W. Watson for a period of three years commencing as of March 1, 1937 and ending March 1, 1940, pursuant to which C. W. Watson will serve as President of this Corporation at an annual salary of $18,000.00 per year, payable monthly; (2) That said contract shall also provide that in addition to such salary, the indebtedness of C. W. Watson, *81 evidenced by his note, shall be fixed at $219,000.00 and shall be reduced at the rate of $3,333.00 per month as long as such employment continues; it being expressly understood that no interest shall be charged against said indebtedness so long as such employment continues and that all accumulated interest to date is waived as additional consideration for the execution by C. W. Watson of such contract; (3) That upon the execution of said contract by C. W. Watson in form satisfactory to counsel for this Corporation, this Corporation shall as further consideration for the execution of said contract by C. W. Watson deliver to him voting trust certificates for 40,000 shares of the common stock of this Corporation and shall give and grant unto said C. W. Watson, his heirs and assigns, the exclusive right, privilege and option of acquiring from this Corporation at any time during the calendar year 1938, voting trust certificates for not exceeding 20,000 shares of the common stock of this corporation at the nominal price of $.10 per share and also of acquiring from this Corporation at any time during the years 1939, 1940 and 1941 voting trust certificates for 40,000 additional shares of *82 said common stock at the nominal price of $.10 per share; such rights, privileges and options to be independent of each other; (4) That upon the assignment to this Corporation by C. W. Watson of his option to purchase voting trust certificates for 40,000 shares of common stock of this Corporation; at the nominal price of $.10 per share at any time during the years 1939, 1940 and 1941 this Corporation shall accept said assignment as collateral for the indebtedness of C. W. Watson to this Corporation in place of the collateral now held by it and shall return and deliver to the said C. W. Watson the collateral now held by it.' "If the terms of your employment as set forth in the foregoing resolution are satisfactory to you, please indicate your acceptance thereof by signing a copy of this letter attached hereto and return the same to us, thereby making this letter and the acceptance thereof a binding contract between us. "Very truly yours, THE ELK HORN COAL CORPORATION By (S) J. F. Caulfield Vice President "I hereby accept the office of President of The Elk Horn Coal Corporation, upon the terms and conditions set forth in the resolution of the Board of Directors above quoted. "(S)C. *83 W. Watson" Pursuant to that contract, Elk Horn reduced the indebtedness of Watson to it, as shown by its books, by the amount of $3,333 per month throughout the period from March 1, 1937 to and including the month of May, 1940. In his income tax return for the year 1937 Watson reported salaries from Elk Horn as follows: Elk Horn Coal Corporation
$52,455.00
40,000 Voting Trust Certificates
40,000.00
Total
$92,455.00 This return was prepared by the secretary to Watson, who included the monthly reductions of $3,333 in decedent's income as compensation, because of the inclusion of that data on the information return filed by Elk Horn for that year. Upon learning of that action of his secretary, decedent severely criticized him for doing so. Because of a considerable net loss in that year, however, that treatment had no effect on petitioner's taxable income for that year. In 1938 and 1939 Watson reported his compensation from Elk Horn as follows: 1938
Salaries and other compensa-
tion, Elk Horn Coal Corpo-
ration as reported on Form
1099
$53,214.75
Less amount included for for-
giveness of debt and no
funds received
39,996.00
Amount received
$13,218.75
1939
Salaries and other compensa-
tion, Elk Horn Coal Corpo-
ration as reported on Form
1099
$57,527.25
Less amount claimed for fore-
giveness of debt
39,996.00
$17,531.25
*84 In connection with its reorganization Elk Horn filed with the Securities and Exchange Commission a Form 22 in which compensation to be paid Watson was set out as $48,580, with the statement that he had received voting trust certificates representing 40,000 shares of the corporation's common stock. On that report, under schedule VI, the amount of the reported compensation represented by a reduction on Watson's note was credited to income. The method of Elk Horn in treating this item had been by a charge to administrative expense and a credit to earned surplus, under which no decrease ir net earnings would be reflected, but subsequent to the filing of the report, upon exception taken by the listing section of the Securities and Exchange Commission, the method of treating the item was changed to show a charge to administrative expense and a credit to capital surplus. This was required by reason of the fact that in setting up the books in December 1936, under the reorganization, the entire amount of the indebtedness as it stood in the sum of $200,000 had been charged to capital surplus. Thereafter, in accord with the treatment required, the amount credited upon Watson's note for each *85 year was treated as a deduction by Elk Horn in computing net income upon its returns for 1938 and 1939. In the three years 1938, 1939 and 1940, the income and excess-profits tax returns of Elk Horn showed respective losses of $710,872.10, $925,735.32 and $594,465.23. It continued to have substantial losses for 1941. Respondent has included the amounts of the monthly reductions of Watson's note to Elk Horn in decedent's income for the respective years in which those reductions occurred. The petitioner contests the propriety of this action and thus raises the only submitted issue. The monthly reduction of $3,333 in Watson's indebtedness to Elk Horn constituted cancellations pro tanto of that indebtedness as and when made and not payment of the debt in those amounts. Opinion The respondent supports his contested action on the premise that the monthly reduction of decedent's indebtedness to Elk Horn was not the cancellation or forgiveness of a debt in those amounts as and when the reductions were made, but was the payment of the debt pro tanto. He cites such cases as , affirming ; *86 cert. den., ; [Dec. 8187]; and , affirming a Memorandum Opinion of this Court. And, even if the effect of these reductions was the cancellation of a debt of decedent to Elk Horn in those amounts, he argues, they are includable in decedent's income as consideration he received for services rendered Elk Horn under the contract set out in the facts. He argues this is so, despite the insolvency of decedent both before and after the several reductions, under his Regulations 101, art. 22 (a)-14, and Regulations 103, sec. 19.22 (a)-14. Taxation is a practical matter. Substance and not form is controlling. . It is true that some formal basis exists for the argument that the contract under which Watson served Elk Horn during the taxable period included the monthly reductions in his debt as part of his compensation. It is to be noted, however, that the provision of the contract relating to the monthly reduction of the debt was contained in a separately *87 designated section of the contract and referred to the reduction as being "in addition to such salary." Whatever may be the effect of this circumstance, a reasonable and realistic approach to the situation disclosed by this record convinces us that Elk Horn neither intended to nor paid decedent additional compensation in the amount of $3,333 a month during the period in controversy, but merely cancelled his debt, pro tanto, as and when these reductions were made. We have so found. Watson had never received more than $25,000 a year as chairman of the board - a position that was eliminated when he was elected president. In fact, he had never received more than $18,000 a year after 1931. And during most of that time his remuneration was at the reduced rate of $9,000 a year. When the salaries of Watson and all other salaried employees were proportionately lowered, nothing was done affecting the monthly reduction of $3,333 in Watson's debt. His services were no different during that period than in the preceeding years. The company did not have a prosperous history, at least from 1931 forward: It suffered since that time not only from the effect of the depression generally, but from *88 the chaotic conditions of the coal industry. It had been in the hands of a receiver and was just emerging from a reorganization under section 77B of the Federal Bankruptcy Act. It is true that Watson was the key figure in securing the finances with which the reorganization was accomplished and around whom it was effected. But those who furnished the money for this reorganization knew nothing of Watson's note to the company. Its reduction or cancellation was not made a condition of Watson's employment by them or Watson. He was 72 years old when the contract was executed. He was holpelessly insolvent. The debt meant nothing to him nor to Elk Horn. They had already set up a reserve against it in its full amount less the value of the collateral protecting it. Watson never had and never was intended to have a right to receive the amounts of these monthly reductions and thus could not have assigned that right. The only reason for including the provision reducing Watsons' debt was that the officials of Elk Horn other than Watson desired to provide what they thought was a legal basis for the elimination of this item from Elk Horns' books without its payment. The reasonableness of our conclusion *89 is made obvious by the mere statement of the contrary assumption necessary to respondent's position. That assumption is that Elk Horn, in the situation described, intended to and actually more than trebled Watson's salary and paid him, not $18,000 per year, but about $58,000 per year. Our conclusion is not affected by the treatment of these reductions on decedent's 1937 tax return, explained as it was by his secretary who prepared that return. Nor is it disturbed by the treatment of these items in the report of Elk Horn, as reorganized, to the Securities and Exchange Commission or the income tax returns of that company for 1938 and 1939. That treatment was explained. It did not effect any tax saving to Elk Horn because of the consistently large losses. Moreover, Watson was not a party to any of these reports and, so far as we are informed, knew nothing of them. They were those of a separate taxpayer. We think the monthly reductions of $3,333 in Watsons' debt to Elk Horn were mere cancellations pro tanto of his debt to Elk Horn. That they may have been a recited consideration for his services to the company does not render them taxable income to Watson. Throughout the taxable *90 period he was insolvent by more than $220,000. Thus he was insolvent after as well as before each cancellation. He received no financial benefit from any of them. In view of that fact, Watson realized no income from the several reductions of his indebtedness to Elk Horn. , and cases there cited. The deficiencies and penalty will be recomputed under Rule 50. Decision will be entered under Rule 50.